Robert J. ABLES

v.

The UNITED STATES.

No. 666–80C.

United States Claims Court.

May 19, 1983.

Robert J. Ables, pro se.

Lorraine B. Halloway, Washington, D.C., with whom was Asst. Atty. Gen. J. Paul McGrath, Washington, D.C., for defendant; Major David W. Kerber, Dept. of Air Force, Washington, D.C., of counsel.

## OPINION

LYDON, Judge:

This case comes before the court on defendant's motion for summary judgment and plaintiff's opposition thereto. The issue in this case is whether plaintiff, a neutral arbitrator, on a tripartite arbitration panel, has standing to sue as a third-party beneficiary of an arbitration agreement between the American Federation of Government Employees (AFGE) and the United States Air Force Logistics Command (AFLC). This issue was framed by the United States Court of Claims in its Order of March 26, 1982. *Ables v. United States,* 230 Ct.Cl. ——.

### I

In January 1978, the AFGE was certified as the exclusive bargaining agent for civilian employees of the AFLC. Negotiations between AFGE and AFLC representatives on a collective bargaining agreement began in June 1978. These negotiations continued through the summer of 1978. At some point during this period, the AFGE called in

the Federal Mediation and Conciliation Service (FMCS) in an effort to resolve a number of differences between the parties. When a last attempt at settlement failed in October 1978, the parties, AFGE and AFLC, decided to resolve remaining differences by using a new procedure called interest (or contract) arbitration.[1] This arbitration procedure, agreed to by the parties on October 11, 1978, provided in pertinent part:

> 5. The arbitration panel shall decide only issues which are negotiable. In the event of a dispute over negotiability, the arbitration panel shall not presently decide such issue, but shall retain jurisdiction pending determination of the negotiability of that issue.

> \* \* \* \* \* \*

> 10. Each party shall pay the costs and expenses of the member they select. The parties shall share equally the costs and expenses of the neutral member.

Under the arbitration agreement, the parties agreed to submit their differences to a tripartite panel composed of one member selected by each party. The neutral member, designated chairman of the panel, was chosen by the parties from a list of arbitrators provided by the FMCS. The parties selected plaintiff to serve as the neutral member of the tripartite panel.

On October 26, 1978, the FMCS wrote to plaintiff as follows:

> You are hereby appointed neutral member of the tri-partite panel in accordance with the agreement between the parties above captioned. A copy of the pertinent agreement is enclosed.

> The parties plan to start the hearings on November 13, 1978 and at least a week should be blocked out. If more time is

---

1. It would appear that this new procedure was drawn up by the Federal Mediation and Conciliation Service (FMCS). Under this new procedural agreement, unresolved issues would be put before a tripartite arbitration panel composed of one member appointed by the American Federation of Government Employees (AFGE) and one member appointed by the Air Force Logistics Command (AFLC). The third member of this panel was to be appointed jointly by the parties. The panel would examine the submissions of the parties and would have the option of selecting either submission or suggesting another. If the panel's suggestions were unacceptable to either party, however, the panel would have to select one of the parties' submissions.

necessary, the parties would like to begin again on November 27, 1978. Further details will have to come from the parties or the other members of the board. You will find their names and addresses on the attached page.

I want to thank you for agreeing to serve as the neutral member of the board.

The arbitration agreement of October 11, 1978 was executed on behalf of AFLC by Val Buxton (Buxton), who was then chief labor negotiator for the AFLC, Robert M. Watson (Watson), who was then Director of Civilian Personnel for AFLC, and Ronald Sanders (Sanders), who was then a Labor Relations Specialist for AFLC. It would appear that this agreement was drafted by the FMCS and presented to the parties for review and approval. With respect to paragraph 10 of this agreement, the affidavits of Buxton, Watson, and Sanders, submitted in support of defendant's motion for summary judgment and not otherwise disputed, establish that there were no discussions whatsoever between the parties and/or the members of the panel relative to this paragraph, which ostensibly was accepted by the parties as drafted by the FMCS without discussion, prior to execution of the arbitration agreement.

Buxton, Watson and Sanders stated that at the time they signed the arbitration agreement, they believed the sole purpose of said agreement was to resolve the differences that existed between the parties. In signing the agreement, Buxton, Watson and Sanders stated that there was no intent to affect AFLC's practice, policy or procedure for payment of arbitrators; that they had no authority to obligate government funds for payment of arbitration services; and that they did not intend that the agreement create any right of payment to any of the arbitrators. The FMCS did not, at any time material herein, discuss the specific language nor the intent of paragraph 10 with the parties. Further, the parties never questioned FMCS as to the intent or meaning of paragraph 10 nor did they ask the FMCS relative to the interpretation to be placed on said paragraph. At the time

the October 11, 1978, agreement was executed by the parties, neither party knew that plaintiff would be the neutral arbitrator. At the time the arbitration agreement was executed, Buxton, Watson and Sanders stated they were aware that in rights (or grievance) arbitration proceedings the parties thereto generally shared the cost and expense connected with the use of arbitrators. Further, they were also aware that the Air Force had separate internal procedures for contracting with and paying arbitrators for their services. Finally, neither Buxton, Watson nor Sanders, individually, or as a group, had any authority to obligate Air Force funds to pay for arbitration services, and their participation in the arbitration agreement conferred no authority on them to waive their lack of authority to bind the Air Force by obligation of Air Force funds to pay for arbitration services. The authority to pay for arbitration services rested on action by Air Force personnel other than Buxton, Watson and Sanders and such authority was separate from and independent of the arbitration agreement.

At times material herein, it was the practice, policy and procedure, sanctioned by pertinent regulations, of the AFLC to issue purchase order contracts in connection with the use of and payment for arbitrators, whose services were considered by AFLC to be "Non Personal Services," within the purview of applicable regulations. *See* Defense Acquisition Regulations (DAR), Secs. 22–102.2, 22–102.3, and 22–102.4. Contracts with arbitrators are deemed "Service Contracts" under applicable regulations. DAR 22–101(b)(xx). These purchase order contracts were separate and distinct from the arbitration agreement referred to above.

On November 21, 1978, AFLC issued purchase order contract No. F 3360179M1290 which designated plaintiff as the "Contractor/Quoter," noted that a confirmation order had been placed with plaintiff, and stated that plaintiff was to perform:

Non Personal Services
Serve As The Neutral Member Of A Tripartite Arbitration Panel Convened To Resolve Issues In Dispute Between The

Air Force Logistics Command and The American Federation Of Government Employees In Their Negotiations For A Command-Wide Labor Agreement

Plaintiff thereafter signed this purchase order contract. The purchase order contract provided for payment for arbitration services by plaintiff covering the period October 27, 1978 through December 29, 1978. It also specified that these services were to be performed in two job units, one job unit running from October 27, 1978 through November 28, 1978, in the amount of $1,369.89, and one job unit from December 1, 1978, through December 29, 1978, in the amount of $3,388.06, for a total of $4,757.95. This contract for arbitration services by plaintiff was extended such that the last extension of the contract covered a period ending on November 14, 1979. No written or oral contract between plaintiff and AFLC existed for arbitration services by plaintiff after November 14, 1979.

Between October 26, 1978 and November 14, 1979, the tripartite panel held several meetings with representatives of AFGE and AFLC pursuant to the arbitration agreement of October 11, 1978. In November 1978 the parties exchanged offers, and, in December 1978 held hearings and meetings under panel supervision. On April 3, 1979, a collective bargaining agreement, covering most of the issues in dispute, was agreed to by the parties. Those issues not covered by the agreement were reserved for handling by the arbitration panel as provided for in paragraph 5 of the arbitration agreement, *supra.*

Thereafter, a dispute developed between the parties relative to the jurisdiction of the arbitration panel to deal with these reserved issues. As a result of this dispute, AFLC advised plaintiff, as Chairman of the tripartite arbitration panel, by letter dated November 14, 1979 as follows:

> We have carefully considered your ruling as Chairman of the tripartite arbitration panel, dated 24 October 1979 in response to the union's demand that the panel hold hearings on disputed negotiability matters prior to the FLRA deciding the mer-

its of outstanding negotiability disputes. For the reasons stated below, we have rescinded the agreement between AFLC and AFGE and have decided to leave the resolution of remaining impasses to the Federal Service Impasses Panel [FSIP]. Our decision is based upon what we consider to be a material breach of the interest arbitration agreement between AFLC and AFGE. As we explained in our letter of 17 September 1979, we did not agree to submit disputes over the substantive meaning of this agreement to the arbitration panel for resolution. In addition, our consent to use a tripartite panel was based upon an agreement with AFGE that no hearings would be held on the remaining issues until the FLRA negotiability decision is issued. It is now apparent that these essential conditions to our participation have been altered by AFGE. Your announced position supports that alteration and would force us to operate under an arrangement substantially different from the agreement reached in October and November 1978. Thus, we no longer consider the tripartite panel to be an acceptable alternative to the FSIP.

> Although we are terminating the use of the tripartite panel for any remaining impasses, we nevertheless appreciate your extraordinary efforts and abilities in helping the parties to reach agreement on those issues previously before you. You may submit your final fee statement for services already rendered to my attention at your earliest convenience.

Plaintiff thereafter submitted a bill and was paid for his services through November 14, 1979.

By letter dated December 10, 1979, plaintiff advised the Chairman of the Federal Labor Relations Authority (FLRA) in pertinent part as follows:

> A substantial controversy developed later, however, whether or not the arbitration panel had to wait until all reserved issues had been decided as to negotiability or the panel could proceed to arbitrate such issues which had been finally deter-

mined to be negotiable. In this latter group would be decisions by the Department of Defense that certain issues were negotiable, from which decision the Logistics Command could not appeal, thereby making the decision final that the issue was negotiable.

On October 24, 1979, I supported the union's position that the arbitration panel could proceed, now, to decide, on their merits, such issues as had already been determined to be negotiable. * * *

On November 14, 1979, the Air Force Logistics Command, in a letter, disagreed with my ruling and gave notice it was withdrawing from the final offer agreement with the AFGE. A copy of that letter is enclosed.

The command also, effectively, dismissed me from further participation from the case and asked for a final bill for my services.

On November 23, 1979, Mr. Kenneth T. Blaylock, National President, AFGE, by letter asked the Federal Services Impasses Panel to advise the tripartite panel that it still had jurisdiction of the dispute. * * *

Obviously things are in a muddle. I will not attempt at this time to sort out all the legal ramifications of the dilemma, but I do have some considered thoughts.

I do not think a tripartite panel loses jurisdiction of a dispute which the parties have referred to it by contract because one of the parties is disappointed with the decision of the majority of the panel.

My decision stands that our panel has jurisdiction to hear, now, issues which have been determined to be negotiable. Accordingly, I will call for hearings on the merits of those issues, even if we must proceed on an ex-parte basis.*

Plaintiff thereafter filed suit in the Court of Claims to recover this amount. Both parties moved for summary judgment.

In its order of March 26, 1982, the Court of Claims held that there was no contractual basis for plaintiff's claim under 28 U.S.C. Sec. 1491 since the only express contract plaintiff had with AFLC had expired before the 1980 services for which plaintiff seeks recovery began, and a contract could not be implied in fact in the face of an express statement by AFLC before the services were performed that it would not pay for said services. 230 Ct.Cl. at ——. Under the law of the case doctrine, this holding is binding on plaintiff. *Department Of Natural Resources And Conservation Of The State of Montana v. United States,* 1 Cl.Ct. 727, 732–735 (1983) (LYDON, J.).[2]

However, the Court of Claims did not dismiss plaintiff's petition. Instead, it remanded the case to the trial division for further proceedings after stating in pertinent part:

The position of arbitrators of disputes involving the United States Government is anomalous, and not one that was foreseen when the Tucker Act was written.

---

* In my opinion on October 24, 1979, I had set hearings for December 3, 1979 on the merits of issues found to be negotiable. The letter on November 14 from the Command and the letter on November 23 from the AFGE made it unrealistic to proceed with the hearings set for December 3, 1979; thus I postponed those hearings. On the question of pay by the Command for my services if we go forward on an ex-parte basis, I am satisfied that available remedies at law will protect my interests.

Plaintiff continued to perform as an arbitrator subsequent to November 14, 1979. He held panel sessions without the participation of the AFLC and its designated panel member and rendered a subsequent decision on certain issues. On May 12, 1980, plaintiff submitted a bill for services rendered from December 11, 1980, through May 12, 1980 to AFLC in the amount of $1,852.01. AFLC refused to pay this bill on the ground that it had not contracted with plaintiff for any services beyond November 14, 1979.

2. Plaintiff's motion for relief from this holding was denied by the Court of Claims by Order dated August 20, 1982. In its motion plaintiff contended that in essence the contract for his services did not expire, in actuality, since the AFLC's termination of his services reflected "bluffing" and represented merely a tactical position. Plaintiff seemingly still refuses to recognize the finality of the holding of the Court of Claims that in this litigation his claim has no direct contractual foundation.

In the absence of legislation to regularize their position respecting compensation, persons such as Mr. Hagan and Mr. Ables may serve at their peril in certain contingencies. The only other possibility is that Mr. Ables might have standing to sue as third party beneficiary of the agreement between the union and the Air Force for "the procedure for the resolution of the remaining issues in their collective bargaining negotiations." Because of that possibility, we do not dismiss the petition, but we cannot rule on the issue without a knowledge of collective bargaining practice incident to that agreement that we do not possess.

Plaintiff's motion for judgment on the pleadings (or summary judgment), is denied. Defendant's motion for summary judgment is denied. Both denials without prejudice. The cause is remanded to the trial division for further proceedings.[3]

Defendant has moved for summary judgment, supported by five affidavits and other documentary materials. Three of these affidavits were executed by Buxton, Watson, and Sanders, the individuals who signed the arbitration agreement on behalf of AFLC. Plaintiff opposes defendat's motion on the grounds that a trial to get the facts is necessary. In support of his position, plaintiff attaches to his opposition brief a letter from General Counsel, FMCS to the Assistant Attorney General, Civil Division, Department of Justice.

In his complaint, plaintiff seeks to recover $1,852.01 representing the AFLC's share of the cost of his services and expenses for the period December 11, 1979–May 12, 1980, involving 12.25 days of work. In addition, plaintiff seeks to recover (1) consequential damages; (2) interest, costs and attorney's fees; and (3) such other relief as the court may direct.

## II

Plaintiff was not a party to the arbitration agreement between AFGE (the union) and AFLC (the Air Force). The question here is whether plaintiff has any enforceable rights as a third party beneficiary of this agreement.

Third party beneficiary law has been plagued by uncertainties, doctrinal and conceptual difficulties, and confusion. It has been the subject of much discussion and decisional conflict.[4] Corbin referred to this area of the law as a "morass." 4 *A. Corbin, Contracts,* Sec. 772 at 3 (1951). At best, one can anticipate difficulties when entering the thicket of third party beneficiary law in conventional situations which serve as illustrations and points of discussion in the Notes, Comments and Restatements on this subject matter. See note 4, *supra.* The matter at hand, however, does not fit neatly into the categories of third party beneficiaries discussed in those writings or in existing case law in this area. Accordingly, the matter at hand has proved most troublesome. One test for determining enforceability of third party beneficiary claims, followed by many courts, is whether the agreement at issue intended to benefit third party. See *J.D. Calamari and J.M. Perillo, Contracts,* Section 244, n. 13 (1970). This intent to benefit test has been utilized by the United States Court of Claims in third party beneficiary suits and it is accordingly appropriate to use this test in this case.

---

3. The Court of Claims had raised the third-party beneficiary issue *sua sponte.* Defendant's motion for a rehearing of this aspect of the March 26, 1982 order was denied by the Court of Claims by Order dated April 27, 1982 without any discussion. In its motion defendant stressed the fact that the issue of recovery by plaintiff on the basis of a third-party beneficiary was not raised nor briefed by either party. Further, defendant argued that there was no basis supportive of any such recovery in this case.

4. See Note, *Martinez v. Socoma Companies: Problems In Determining Contract Beneficiaries' Rights,* 27 Hastings L.J. 137 (1975–76); J.D. Calamari and J.M. Perillo, Contracts, Sections 243–53 (1970); Note, *Third Party Beneficiaries And The Intention Standard: A Search for Rational Contract Decision-Making,* 54 Va.L.Rev. 1166 (1968); Comment, *The Third Party Beneficiary Concept: A Proposal,* 57 Colum.L.Rev. 406 (1957). *See also Restatement of Contracts,* Sections 133–47 (1932) *compare with Restatement, Second, Contracts,* Sections 302–315 (1979).

■ Before an individual who is not a party to an agreement may sue for breach of that agreement, "he must at least show that it was intended for his direct benefit." *Robo Wash, Inc. v. United States,* 223 Ct.Cl. 693, 697–98 (1980), citing *German Alliance Ins. Co. v. Home Water Supply Co.,* 226 U.S. 220, 230, 33 S.Ct. 32, 35, 57 L.Ed. 195 (1912) and *Bogart v. United States,* 209 Ct.Cl. 208, 214, 531 F.2d 988, 991 (1976). Thus, the question to be answered here is whether the agreement between the union and the Air Force was intended to benefit directly the plaintiff herein.

■ The uncontested materials at hand indicate that the primary purpose of the agreement between the union and the Air Force was to resolve certain disputed issues. While the agreement contemplated the use of arbitrators to further realization of this primary purpose, the agreement was not entered into for the primary purpose, of benefiting the arbitrators, including plaintiff. See in this regard *Comment, The Third Party Beneficiary Concept: A Proposal,* 57 *Colum.L.Rev.* 406, 413, n. 44 and text (1957). *See also Kanarek v. United States,* 161 Ct.Cl. 37, 40, 314 F.2d 802, 803 (1963). Both the union and the Air Force were intent on protecting their own interests in the agreement. Given the uncontested affidavits of the Air Force members who executed the agreement in question, it is not reasonable to assume that the parties were concerned in executing the agreement about the interests of the arbitrators. *See National By-Products, Inc. v. United States,* 186 Ct.Cl. 546, 573–74, 405 F.2d 1256, 1271 (1969).

The language of the agreement which bears most directly on the issue at bar is to be found in Section 10. Section 10 provides: "Each party shall pay the costs and expenses of the member they select. The parties shall share equally the costs and expenses of the neutral member." While plaintiff benefits from this agreement in the sense that use of his services would result in payment to him by the union and the Air Force, this does not necessarily mean that the agreement itself was intended to create an enforceable right in plaintiff to said payment as an intended beneficiary. Rather, this indeterminate language suggests that plaintiff's enforceable rights to payment for these services would emanate from separate and independent agreements plaintiff would have with the Union and the Air Force. Uncontested facts support this interpretation. The most that can be said for plaintiff's position under the agreement in question is that he was an incidental beneficiary. As such, he has no enforceable rights under the agreement. *See Restatement, Second, Contracts,* Sec. 302(e) (1979); *A. Corbin, Contracts,* Sec. 779C at 40–41 (1951).

It is accepted that intent as utilized herein is a question of fact. *See United States v. Carpenter,* 113 F.Supp. 327, 329 (E.D.N.Y.1949). The undisputed facts discussed below establish to a reasonable and rational degree that plaintiff, under the agreement between the union and the Air Force, was not intended to be a third party beneficiary with enforceable rights to payment for his services and costs emanating from said agreement.

Uncontested affidavits from Air Force signatories to the agreement in question persuade that plaintiff was not intended to be a third party beneficiary of said agreement. This is deemed sufficient to deny plaintiff any status as a third party beneficiary under the agreement. *See Visor Builders, Inc. v. Devon E. Tranter, Inc.,* 470 F.Supp. 911, 923 (1978). There is no suggestion, in any event, from plaintiff that either the union or the FMCS intended that he be a third party beneficiary of the agreement in issue. It would appear, however, that the FMCS feels that an arbitrator should be paid for his services in ex parte situation such as took place in this case, but there is no hint or suggestion that the right to said payment rests on the assertion that plaintiff was a third party beneficiary of the agreement between the union and the Air Force.

Applicable Defense Acquisition Regulations (DAR) and attendant Air Force procedures required that arbitration services be

specifically contracted for by means of "Purchase Orders," a standardized practice that supports the view that the agreement in issue was not intended to provide plaintiff with enforceable rights relative to his performance of arbitration services. The uncontested affidavits submitted by defendant suggest that any such enforceable rights would have to come from the employment contracts plaintiff reached with the union and the Air Force. The agreement at issue did not contain any data relative to the terms of employment, *i.e.,* compensation, periods of service. The contract with the Air Force, *i.e.,* the "Purchase Order," did contain the results of the contract between the plaintiff and the Air Force as to compensation for his services and the tenure of his contract.

The uncontested affidavits from Air Force signatories to the agreement at bar show clearly that they had no authority to grant plaintiff third party beneficiary status. These signatories had no authority to contract on behalf of the Air Force for plaintiff's services. What they could not do directly they certainly should not be allowed to do indirectly under the guise of an intended third party beneficiary. *See Frangella Mushroom Farms v. United States,* 229 Ct.Cl. —— (Order, Nov. 10, 1981 at pp. 6–7). This lack of capacity to bind the Air Force on the part of the Air Force signatories to the agreement precludes plaintiff from having any enforceable third party beneficiary right against the Air Force under said agreement. *See Restatement, Second Contracts,* Sec. 309 (1979).

Plaintiff advises that the Air Force "hired me under my terms of payment and FMCS [Federal Mediation And Conciliation Service] requirements." While the terms of payment may have been plaintiff's, they were embodied in a Purchase Order contract, executed by plaintiff and the Air

Force, which spelled out what he was to be paid and the time period the contract was to run. Thus, plaintiff seems to realize that his enforceable rights emanated, not from the agreement between the union and the Air Force, but from his contract for arbitration services with the Air Force. As to FMCS requirements, applicable regulations show that the FMCS has no power to compel, deny or modify payment of compensation to an arbitrator. These same regulations indicate that fees for arbitration services are generally matters for determination by and between the arbitrator and the parties within a predetermined framework overseen by the FMCS. *See* 29 C.F.R. Sections 1404.4(d) and 1404.16 (1979).[5]

The conduct of the parties before a controversy arises bears on the intent of the parties relative to an agreement and merits consideration. *Macke Company v. United States,* 199 Ct.Cl. 552, 556–57, 467 F.2d 1323, 1325 (1972). On October 26, 1978, plaintiff received a letter from the FMCS advising he had been appointed the neutral member of the tripartite panel and enclosing a copy of the agreement between the union and the Air Force. The FMCS also advised that with respect to the matter, "[f]urther details will have to come from the parties or the other members of the Board." The pertinent names and addresses were supplied plaintiff at that time. Subsequently plaintiff, in working out the further details, executed a Purchase Order contract with the Air Force covering compensation for his services and presumably entered into another agreement with the union regarding compensation for his services. Such conduct suggests rather strongly that enforceable rights regarding payment for his services rested on the agreements plaintiff executed with the Air Force and the union and did not emanate from the agreement between the Air Force and the

---

5. The uncontested facts show that the agreement in issue was drafted by the Federal Mediation and Conciliation Service (FMCS) and presented to the parties. With reference to Section 10, uncontested facts establish that there was no discussion about this Section between the union, the Air Force and the FMCS.

There is nothing to suggest that the FMCS intended that Section 10 provided plaintiff with enforceable rights as a third party beneficiary relative to compensation matters. The applicable regulations, 29 C.F.R. Section 1404.16, suggest otherwise.

union. Moreover, such conduct supports the view that plaintiff did not rely on the agreement between the union and the Air Force for his compensation rights but on the separate and independent contracts he reached with each of the parties. Without such reliance, plaintiff is not entitled to be deemed a third party beneficiary of the agreement between the Air Force and the union. *See* Note, *Third Party Beneficiaries And The Intention Standard: A Search For Rational Contract Decision-Making,* 54 *Va. L.Rev.* 1166, 1188–90, 1192 (1968); *A. Corbin, Contracts,* Sec. 779B at 38–40 (1951).[6]

On November 14, 1979, the Air Force notified plaintiff that it had rescinded the agreement between AFLC and AFGE and would leave resolution of remaining impasses to the Federal Service Impasses Panel. Plaintiff was advised to submit his final fee statement for services previously rendered. It is clear plaintiff was aware that the Air Force would not extend his purchase order contract to cover services beyond November 14, 1979, and that the Air Force would not pay him for any arbitration services performed beyond November 14, 1979.

Assuming *arguendo* that plaintiff is deemed to be an intended third party beneficiary of the agreement between the Air Force and the union, the November 14, 1979 rescission of the agreement served to eliminate whatever third party beneficiary rights plaintiff may have previously had under said agreement. There was no provision in the agreement that precluded a party from varying, modifying or rescinding the agreement. *See Restatement Second, Contracts,* Sec. 311(f) at 466 (1979); *see also J.D. Calamari and J.M. Perillo, Contracts,* Sec. 251 at 395–398 (1970) and Comment, *The Third Party Beneficiary Concept: A Proposal,* 57 *Colum.L.Rev.* 406, 426–27 (1957). In this case plaintiff performed the

services for which he now seeks recovery after receiving notice of the dissolution of the agreement on which his third party beneficiary status depended and before his enforceable rights relative to performance of said services had vested. The fact that ex parte proceedings continued after dissolution of the agreement does not detract from the fact that subsequent to November 14, 1979, the Air Force clearly manifested to plaintiff that it was no longer under any contractual arrangement, third party beneficiary or otherwise, to pay for plaintiff's services subsequent to November 14, 1979. The Air Force's intent in this regard was crystal clear. *See Visor Builder's, Inc. v. Devon E. Tranter, Inc., supra,* 470 F.Supp. at 923. Under such circumstances, he had no third party beneficiary status at the time he performed these services and he performed them at his peril. *See Hagan v. United States,* 229 Ct.Cl. ——, 671 F.2d 1302, 1304 (1982); *see also Ables v. United States, supra,* (Order of Mar. 26, 1982 at p. 4).

Finally, defendant notes that plaintiff's purchase order contract contained a termination for convenience clause which provided that the contracting officer may terminate the contract when in the best interest of the government. The contract clause also provided that when a contract for services was terminated, the government would only be liable for services rendered prior to the date of termination. Defendant suggests that a termination for convenience of plaintiff's arbitration services contract did occur and thus plaintiff is not entitled to recover herein. Defendant argues that if plaintiff is deemed to be a third party beneficiary, such a naked holding would effectively nullify the right of the government under the express contract to the bargained for termination for convenience provision.

**6.** Defendant's reliance on the fact that plaintiff was not named in the agreement at the time it was executed is misplaced. It is only necessary that the beneficiary be identified before he has an enforceable right. *See A. Corbin, Contracts,* Sec. 781 at 70 (1951). However, the lack of identity of the beneficiary at the time the agreement is executed may have a bearing on whether the person was intended by the

parties to be a third party beneficiary. *See Restatement, Second, Contracts,* Sec. 308 at 457 (1979). In this case, this factor is not controlling nor really significant but it is one that adds further support to the view reached herein that plaintiff was not intended to be a third party beneficiary of the agreement between the union and the Air Force.

To counter such a possibility, defendant further argues that if plaintiff is allowed to rely, as a third party beneficiary, on the agreement between the union and the Air Force as a basis for recovery of compensation for his services after November 14, 1979, that agreement must be deemed to include a termination for convenience clause, citing *G.L. Christian & Associates v. United States,* 160 Ct.Cl. 1, 11–12, 312 F.2d 418, 424, *cert. denied,* 375 U.S. 954, 84 S.Ct. 444, 11 L.Ed.2d 314 (1963). The right of a third party beneficiary is described as a contract right. *See A. Corbin, Contracts,* Sec. 779J at 59 (1959). Defendant advises that applicable regulations required service contracts to contain the standard termination for convenience clause, *i.e.,* DAR 7–1902, 7–1902.16 (1976 and 1979). In either event, defendant maintains, plaintiff is not entitled to recover herein and defendant's motion for summary judgment must be granted. In light of the conclusion reached herein that plaintiff is not entitled to third party beneficiary status, it is unnecessary to rest decision on these final arguments of defendant.

Plaintiff's response to defendant's motion for summary judgment is cavalier in approach, skimpy on discussion and authorities, and devoid of any materials which would serve to contest the affidavits and other documentary materials defendant attached to its motion in support thereof. It failed completely to offer any assistance to the court on the troublesome issue of third party beneficiary entitlement.

7. Attached to plaintiff's response to defendant's motion for summary judgment is a letter dated July 21, 1982 from the General Counsel, FMCS to the Assistant Attorney General, Civil Division. A reading of this letter shows it to be irrelevant to the issue of plaintiff's third party beneficiary status now before the court.

8. In refusing to dismiss plaintiff's petition (complaint) because of the possibility that plaintiff might have third party beneficiary status, the Court of Claims noted, " * * * but we cannot rule on the issue without a knowledge of collective bargaining practice incident to that agreement that we do not possess." In remanding "for further proceedings," the court did not restrict the proceedings to a trial only. Summary judgment, with properly supported affidavits and related materials, is also deemed

The essence of plaintiff's response is the same as it was when plaintiff first moved in the Court of Claims for judgment on the pleadings, *i.e.,* he is entitled to be paid for his arbitration services "until the work is done or both parties terminate the proceedings." Plaintiff ignores the March 26, 1982 order of the Court of Claims in his motion in this regard. 230 Ct.Cl. ——.

As to the probability of plaintiff being a third party beneficiary of the agreement between the union and the Air Force, an issue remanded to the trial division by the Court of Claims, plaintiff dismisses defendant's position that plaintiff is no more than "an incidental beneficiary" with the observation:

By now there are literally thousands of arbitrators' decisions under collective bargaining agreements in the federal sector with such phrase agreeing to share charges. It should mean to the AFLC what the phrase means to everyone else— to pay the bill.

Plaintiff offers nothing more on the crucial issue of his entitlement to third party beneficiary status.[7]

In essence, plaintiff's response to defendant's motion for summary judgment is a simple "Let the facts come out at trial." [8] The problem is plaintiff does not set forth what material facts he wishes to come out at trial.

RUSCC 56 provides in pertinent part:

to constitute appropriate proceedings. Affidavits submitted by defendant set forth the extent of the "collective bargaining practices incident to that agreement." Plaintiff has not countered these affidavits, nor proffered any to suggest that it was more than what defendant's affiants said it was. The letter plaintiff attaches to its response (*see* note 7, *supra*) in no way bears on the collective bargaining practice incident to the agreement in issue. Under such circumstances, it is not unreasonable to accept defendant's affidavits on the matter. *See Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216, *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *rehearing denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960).

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him.

Merely responding, "Let the facts come out at trial" is insufficient to defeat a properly supported motion for summary judgment. *Royal Indemnity Co. v. United States,* 178 Ct.Cl. 46, 51–52, 371 F.2d 462, 465 (1967); *Curtis v. United States,* 144 Ct.Cl. 194, 199, 168 F.Supp. 213, 216, *cert. denied,* 361 U.S. 843, 80 S.Ct. 94, 4 L.Ed.2d 81 (1959), *rehearing denied,* 361 U.S. 941, 80 S.Ct. 375, 4 L.Ed.2d 361 (1960). Plaintiff must set forth specific facts through affidavits, pleadings or other reliable means to show that a genuine issue of material fact exists. *Harlee v. Hagen,* 538 F.Supp. 389, 393 (1982). This, plaintiff has failed to do.

Although any existence of genuine issues of fact are to be resolved against the moving party, this does not mean that a party can resist a motion for summary judgment by relying on bare assertions, conclusory allegations or suspicions. *Fireman's Ins. Co. of Newark, N.J. v. DuFresne,* 676 F.2d 965, 969 (3d Cir.1982). *A fortiori* is this true when one, as plaintiff does in his response, fails to articulate the existence of any material fact but asks simply for a trial to get the facts, which facts he fails to identify. A material fact is one that will make a difference in the result of the case. *Curtis v. United States, supra,* 144 Ct.Cl. at 199, 168 F.Supp. at 216. In considering plaintiff's response to defendant's motion for summary judgment, the fact that plaintiff is proceeding *pro se* is not a mitigating factor. Plaintiff is an experienced lawyer of long standing with specialties in several legal disciplines.

### III

In conclusion, it is worth noting the observation made by the Court of Claims in *Ables v. United States, supra.* The court said, "[t]he position of arbitrators of disputes involving the United States Government is anomalous, and not one that was foreseen when the Tucker Act was written. In the absence of legislation to regularize their position respecting compensation, persons such as Mr. Hagen [*Hagen v. United States, supra*] and Mr. Ables [plaintiff herein] may serve at their peril in certain contingencies. * * *"

Defendant's motion for summary judgment is granted, with plaintiff's complaint to be dismissed.